UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

ROY STILTNER,                              )
                                           )
          Petitioner,                      )
                                           )       No. 5:13-CV-203-KKC-HAI
v.                                         )
                                           )       RECOMMENDED DISPOSITION
DEEDRA HART, Warden,                       )
                                           )
          Respondent.                      )
                       ***  ***  ***  ***

        This Recommended Disposition concerns a habeas corpus petition first filed in 2013 by

state prisoner Roy Stiltner that attacked his 1986 conviction and life sentence for murder.  In

2015, following an evidentiary hearing, then-District Judge Thapar adopted the undersigned's

recommendation and dismissed Stiltner's petition as untimely.  D.E. 95.  In 2016, a divided panel

of the Court of Appeals found that Stiltner was entitled to equitable tolling of the statute of

limitations on account of his intellectual disability and remanded the case for further

consideration.  D.E. 99.  After the appellate court's mandate issued, this Court ordered additional

briefing regarding the merits of Stiltner's habeas claim and whether the claim was procedurally

defaulted.  D.E. 102.  The Court then ordered an evidentiary hearing.  D.E. 115.  That hearing

occurred in two parts.  D.E. 157, 165.  Additional briefing followed.  D.E. 170, 173, 176.

Meanwhile, the undersigned issued a recommended disposition concerning the Warden's motion

to amend her answer.  D.E. 168.  That recommendation was adopted.  D.E. 177.

        The undersigned now recommends that Stiltner's petition be dismissed on two

independent grounds.  First, he has not proven the merits of his ineffective-assistance-of-counsel

("IAC") claim.  Second, he has not met his burden to overcome procedural default.  Because this

is a difficult and complicated case, the undersigned will recommend that a certificate of appealability issue.

## I. Background

In 1986, state habeas petitioner Roy Stiltner pleaded guilty to murder in Fayette Circuit Court and received a life sentence. He was charged with first-degree murder (not death-eligible) and being a persistent felony offender. *See* D.E. 112-1. In exchange for his plea, the commonwealth dropped the persistent felony offender charge. *See* D.E. 1-3 at 1-6. The murder occurred March 4, the grand jury indictment was issued on April 7th (D.E. 112-1), and Stiltner pleaded guilty on May 7 (D.E. 1-3 at 1-3). His sentencing hearing occurred on the same day. D.E. 1-3 at 4. Stiltner did not appeal, nor did he collaterally attack his sentence until eighteen years later.

In December 2004, Stiltner, assisted by a fellow prisoner, filed a motion under Rule 11.42 of the Kentucky Rules of Criminal Procedure. D.E. 1 at 3; D.E. 1-8. An attorney was appointed, and the motion was supplemented. D.E. 10-4 at 1-8. The motion argued, among other things, that Stiltner was incompetent to stand trial in 1986 and that his attorney was ineffective for failing to seek a competency evaluation. *See* D.E. 10-4 at 6. The motion sought equitable tolling of the statute of limitations. *Id*. at 2-3. The Fayette Circuit Court dismissed the 11.42 motion as untimely in an order that denied equitable tolling. D.E. 10-4 at 17. In March 2009, the Kentucky Court of Appeals affirmed the order of the Fayette Circuit Court. *Stiltner v. Comm.*, No. 2007-CA-2048-MR, 2009 WL 102975 (Ky. Ct. App. Jan. 16, 2009); D.E. 10-6 at 1-7. Stiltner did not seek discretionary review before the Kentucky Supreme Court.

Stiltner then filed a motion pursuant to Kentucky Rule of Civil Procedure 60.02 on November 13, 2012. D.E. 10-6 at 8-18. That motion argued, among other things, that Stiltner's

counsel was ineffective for failing to seek a competency evaluation before advising Stiltner to plead guilty. *Id*. at 13. On March 25, 2013, the Fayette Circuit Court denied the motion as untimely. *Id.* at 25-28. Stiltner appealed (*id.* at 35), and on February 28, 2014, the Kentucky Court of Appeals affirmed the order of the Fayette Circuit Court. *Stiltner v. Comm*., No. 2013-CA-731-MR, 2014 WL 811836 (Ky. Ct. App. Feb. 28, 2014). Stiltner did not seek discretionary review before the Kentucky Supreme Court.

Stiltner, using prisoner legal aid, petitioned for federal habeas corpus relief in April 2013. D.E. 1. His petition was initially dismissed without prejudice for failure to exhaust state remedies. D.E. 16. In April 2014, following the conclusion of his second state appeal, he filed an amended petition. D.E. 17. Because the petition was clearly filed well beyond the applicable statute of limitations period, the pivotal question became whether Stiltner was entitled to equitable tolling of the filing deadline. D.E. 22.

In 2015, the Court appointed Rachel Yavelak as counsel for Stiltner (D.E. 25) and conducted an evidentiary hearing on whether Stiltner was entitled to equitable tolling in light of his clamed intellectual disability (D.E. 82). Witnesses included Stiltner himself, two fellow-inmates who had helped him with his post-conviction filings, and Dr. Eric Drogin. D.E. 83. Dr. Drogin had conducted a preliminary psychological examination of Stiltner in 2006 but had not formed any diagnoses or issued a full report. *See* D.E. 43-11; D.E. 84 at 45, 49.

Following post-hearing briefing (D.E. 88, 89), the undersigned recommended that Stiltner not be found entitled to equitable tolling. D.E. 91. The undersigned found that Stiltner's intellectual disability, coupled with his "illiteracy, limited vocabulary, and memory problems, made it impossible for him to file—during the limitations period—a habeas petition on his own." *Id*. at 16-17. Nevertheless, because the record indicated that he had the assistance of legal aid

and appointed counsel during the limitations period, the undersigned found that, under existing caselaw, he was not entitled to equitable tolling. *Id*. at 21. Both parties filed objections to the recommended disposition. D.E. 93, 94. Then-District Judge Thapar adopted the recommended disposition in November 2015 and dismissed the petition as untimely. D.E. 95.

Stiltner appealed. In September 2016, a divided Sixth Circuit panel found that equitable tolling was appropriate and reversed and remanded the case. D.E. 99, *Stiltner v. Hart*, 657 F. App'x 513 (6th Cir. 2016).

After the Sixth Circuit issued its mandate (D.E. 100), the Court reappointed Ms. Yavelak (D.E. 101), and ordered the Warden to respond to Stiltner's amended habeas petition (D.E. 102). On March 20, 2017, the Warden responded. D.E. 110. On April 24, 2017, Stiltner, through counsel, replied. D.E. 112.

Stiltner's amended habeas corpus petition requests release on the basis that his counsel at the time of his guilty plea in 1986 was ineffective for failing to investigate the fact that he was mentally incompetent to stand trial. D.E. 17. Although Stiltner's § 2254 petition lists two grounds for relief, his counsel clarifies that the second ground (failure to advise Stiltner of his right to appeal) is merely an aspect of his first ground (that his trial counsel was ineffective and coaxed him into making a plea that was involuntary on the basis of mental incompetence). D.E. 112 at 4, 15. Stiltner therefore presents one ground for relief, which relates to whether he was incompetent to stand trial when he pleaded guilty.

Once the petition was fully briefed, the Court determined that Stiltner's claim was procedurally defaulted. D.E. 115 at 3-5. The Court ordered an evidentiary hearing to address whether he could establish cause to excuse his procedural default. *Id*. at 11. In order to kill the

proverbial two birds with one stone, the parties were also instructed to address the merits of Stiltner's IAC claim.  *Id*. at 12.

The hearing was spread across two days.  On December 12, 2017, Stiltner testified and called the following witnesses:

- Four inmates who knew Stiltner in the 1980s,

- Timothy Riddell, a retired attorney who was named as Stiltner's lawyer on medical release forms 1996 and 1997 (*see* D.E. 90),

- Dennis Burke, the public defender who litigated Stiltner's state post-conviction motions beginning in 2005,

- Brandy Harm, a Kentucky prison official who testified concerning mental health policies, and

- Tina Michelle Bowlin, a paralegal who, under the name Tina Scott, had assisted with the previously mentioned 1996 and 1997 medical release forms.

At the same hearing, the Warden also offered the direct testimony of Dr. Russell Williams, who had conducted a recent psychological evaluation of Stiltner.  D.E. 157, 158.

The hearing reconvened on January 22, 2018, and Dr. Williams was subject to cross-examination.  D.E. 165, 166.  The entire hearing is transcribed in the record.  D.E. 164, 169. Meanwhile, on December 28, the Warden moved to amend her answer to include a defense of laches.  D.E. 160.  On January 24, 2018, the undersigned recommended that the motion be denied.  D.E. 168.  The District Judge adopted the recommendation.  D.E. 177.

## II.  Defining the Issues

The pivotal issues in this case concern the extent of Stiltner's intellectual disabilities during particular periods in the past.  The heart of Stiltner's IAC claim depends on whether he

was incompetent to stand trial at the time of his guilty plea in 1986. Additionally, assuming that mental deficiencies can provide cause to excuse procedural default, Stiltner must also prove that those deficiencies were sufficiently severe to prevent him from pursuing post-conviction relief in state court during the time available for him to do so, May 8, 1986, to October 1, 1997.

### A. Stiltner's Claim is Procedurally Defaulted

Procedural default is a threshold rule; courts generally consider procedural default before addressing the merits of a habeas petition. *Lovins v. Parker*, 712 F.3d 283, 294 (6th Cir. 2013). The procedural default rule is related to the statutory requirement that a habeas petitioner must exhaust any available state-court remedies before bringing a federal petition. *Id.* (citing 28 U.S.C. § 2254(b), (c)). The exhaustion and procedural default rules have the purpose of ensuring that state courts have the opportunity to address federal constitutional claims "in the first instance" before the claims are raised in federal habeas proceedings. *Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default exists when the state court invokes an independent and adequate state procedural rule to dispose of the claim. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017). Default exists even when the state court rules on the merits in the alternative. *Hanna v. Ishee*, 694 F.3d 596, 607 (6th Cir. 2012); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir. 1991). When the final reasoned state court opinion rules in the alternative and one of the alternatives is a state procedural bar, then the claim is defaulted. *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989).

Long after his conviction, Stiltner filed two state post-conviction motions. The first was a motion under Kentucky Rule of Criminal Procedure 11.42, filed in December 2004. D.E. 10-3 at 27. The motion was denied as untimely and not subject to equitable tolling, and this holding was upheld on appeal. *Stiltner v. Com.*, No. 2007-CA-2048-MR, 2009 WL 102975, at *2 (Ky.

Ct. App. Jan. 16, 2009). His second post-conviction motion was also denied on procedural grounds. *Stiltner v. Com.*, No. 2013-CA-731-MR, 2014 WL 811836 (Ky. Ct. App. Feb. 28, 2014).

To be clear, the Kentucky Court of Appeals did not rule on the merits of Stiltner's claim. Granted, the Fayette Circuit Court ruled that the post-conviction was untimely and, in the alternative, that counsel was not ineffective. D.E. 10-4 at 16. However, the Court of Appeals never addressed, even in the alternative, whether Stiltner was competent to stand trial or whether counsel was ineffective. Instead, it found that Stiltner's claimed mental impairment was insufficient to toll the statute of limitations. *Stiltner*, 2009 WL 102975, at *2. The appellate court also found that the Fayette Circuit Court did not err in declining to order a post-conviction mental evaluation. *Id*. The appellate court concluded:

> As set forth above, Stiltner's RCr 11.42 motion was untimely filed, and the time limitation was not subject to equitable tolling. Finally, Stiltner's remaining arguments, that the circuit court erred by concluding that he received the effective assistance of counsel and by applying the incorrect standard in reaching that conclusion, are rendered moot.

*Id*. at *3. Thus, the underlying claim was held to be moot, not decided on the merits.

Stiltner's subsequent motion under Rules 10.02, 10.06, and 60.02 garnered a similar result. The Fayette Circuit Court found the motions to be improperly filed and found "nothing in the record to indicate that at the time of his guilty plea that Stiltner was suffering from any kind of mental illness, disease or defect." *Stiltner*, 2014 WL 811836, at *3. Again the Court of Appeals did not reach the merits of the underlying claim. Turning to the claim in his Rule 10.02 and 10.06 motions, the court held that "this claim lacks merit." *Id*. But in context, "merit" referred to the merit of his argument regarding timeliness. Then, turning to the Rule 60.02 motion, the appellate court found it "was either brought previously in his prior RCr 11.42

motion, or it could have been brought in a timely-filed RCr 11.42 motion." Consequently, the court found that Stiltner "did not properly raise [the claim] in his motion brought under CR 60.02." *Id*. at *4. Thus, again, the Court of Appeals declined to reach the merits, *i.e.*, whether Stiltner's counsel was ineffective in light of his alleged incompetence to stand trial. Stiltner's substantive claim is procedurally defaulted because he has no avenue to raise it again in the state courts.[1]

## B. General Standards for Overcoming Procedural Default

A petitioner may overcome default by showing "cause" and "prejudice" for failing to exhaust. *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015). "[O]nly where a prisoner is impeded or obstructed in complying with the State's established procedures will a federal habeas court excuse the prisoner from the usual sanction of default." *Martinez v. Ryan*, 566 U.S. 1, 13 (2012). The Supreme Court has explained that "cause"

> must be something *external* to the petitioner, something that cannot fairly be attributed to him: "[W]e think that the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."

*Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "A factor is external to the defense if it 'cannot fairly be attributed to' the prisoner." *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017) (quoting *Coleman*, 501 U.S. at 753).

The Supreme Court has adopted an exception to the cause-and-prejudice rule for petitioners who can show they suffered a fundamental miscarriage of justice because they were actually innocent of the crime. *Dretke v. Haley*, 541 U.S. 386, 392-94 (2004). Stiltner argued

---

[1] The Sixth Circuit states in its opinion that this Court "concluded that Stiltner had fulfilled AEDPA's exhaustion requirements." *Stiltner v. Hart*, 657 F. App'x 513, 515 (6th Cir. 2016). To be precise, this Court found that Stiltner had exhausted his available state court *remedies*, but made no statement regarding whether any particular claims may have been procedurally defaulted. *See* D.E. 13; D.E. 22 at 2.

before the hearing that a "fundamental miscarriage" of justice has occurred. D.E. 112 at 10, 17, 20-21. But he admits he killed Robert Pollard. D.E. 164 at 171-72. And his self-defense argument only arose in the course of the hearing and the post-hearing briefing. *Id*. at 166, 172; D.E. 170 at 8. The Court stated in its June 27, 2017 Order that Stiltner "may not avail himself of this exception." D.E. 115 at 6. Stiltner did not raise this exception again, and appears to have abandoned the argument. *See Nelloms v. Jackson*, 129 F. App'x 933, 936-37 (6th Cir. 2005) (refusing to enlarge the "fundamental miscarriage" exception to claims beyond actual innocence).

The procedural default rule is not jurisdictional; it is normally a defense that the state is obligated to raise and preserve. *Gumm v. Mitchell*, 775 F.3d 345, 376 (6th Cir. 2014). Sometimes the state waives, and the court excuses, procedural default because the underlying claim is meritless and thus determining cause and prejudice would be futile. *Id.*; *see also Smith v. Bergh*, No. 15-1699, 2017 WL 448583, at *2 n.1 (6th Cir. Feb. 2, 2017); *Lyons v. Stovall*, 188 F.3d 327, 333 (6th Cir. 1999).

Here, the Warden argues that Stiltner's claim is procedurally defaulted. D.E. 110 at 12-17. Thus, the Court must apply the rule. To overcome default, Stiltner must show cause and prejudice. He claims that his previously-recognized mental impairments meet this standard, but this is not necessarily so. The first issue is whether mental impairments can ever constitute "cause."

### C.  Can Mental Impairments Constitute Cause to Excuse Default?

The Warden correctly notes that "the majority of federal courts of appeals to address the issue of whether mental illness, below-average intelligence, or mental retardation can constitute cause have held that such limitations do not." D.E. 110 at 18. The reasoning behind these

decisions is generally that mental impairments are not "external" to the petitioner and his defense.  Objective externality appears to be a requirement the Supreme Court has adopted for demonstrating cause.  *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017); *Coleman v. Thompson*, 501 U.S. 722, 753 (1991); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

However, the Eighth Circuit has held that mental illness can excuse default, but "the petitioner must make a conclusive showing that he or she was incompetent at the time of the postconviction proceedings."  *Ervin v. Delo*, 194 F.3d 908, 915 (8th Cir. 1999).  The Sixth Circuit has not weighed in on this question in a published case.

Under existing case law, there are two options for addressing the question of whether mental impairment can constitute cause to excuse procedural default.  Either (1) mental impairment can never constitute cause because it is not "external" to the defense, or (2) mental impairment can constitute cause if the petitioner makes "a conclusive showing that mental illness interfered with [the] petitioner's ability to appreciate his or her position and make rational decisions regarding his or her case at the time during which he or she should have pursued post-conviction relief."  *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999).

Stiltner argues that he has established cause because the Court has already found him to be severely mentally impaired; he describes it as "incompetence."  D.E. 112 at 16.  However, the fact that Stiltner's mental impairment was sufficiently severe for purposes of tolling the federal habeas statute of limitations does not translate automatically into cause for excusing a prior state court procedural default.  This is especially true in this case because the time period relevant for procedural default differs from the time period the Court previously considered in relation to the habeas corpus statute of limitations.

10

The Sixth Circuit has confronted the question of whether mental impairment can constitute cause, but the Court did not conclusively answer it. In the unpublished *Johnson* opinion, the Court of Appeals explained:

> While this Circuit has never decided whether a borderline mental impairment can establish cause, the Third, Seventh, Eighth, and Ninth Circuits have all squarely addressed the issue of mental impairment. Each of these Circuits has held that a borderline mental impairment is not a factor external to a defense and, therefore, is not cause for excusing procedural default. *See Hull v. Freeman*, 991 F.2d 86 (3d Cir. 1993) (petitioner's borderline mental retardation did not establish cause because it was not "external" to his defense); *Harris v. McAdory*, 334 F.3d 665, 669 (7th Cir. 2003) (borderline IQ of 76 did not establish cause because it was not a factor "external" to the defense); *Cornman v. Armontrout*, 959 F.2d 727, 729 (8th Cir. 1992) (finding petitioner's below-average intelligence insufficient to establish cause); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988) (petitioner's diagnosis as a "borderline mental defective" was insufficient to establish cause). These holdings are persuasive. Thus, we hold that a borderline mental impairment is not cause for excusing procedural default.

*Johnson v. Wilson*, 187 F. App'x 455, 458 (6th Cir. 2006).

One issue with this holding is that, on its face, the holding is limited to "borderline" mental impairments.[2] *Id.* Presumably, only if a mental impairment is more severe than borderline could it possibly constitute cause to excuse default. Further, because *Johnson* is unpublished, a future panel of the Sixth Circuit could rule differently. *See Clark v. United States*, 764 F.3d 653, 660 n.3 (6th Cir. 2014) ("This court has not squarely considered whether mental illness can constitute cause excusing procedural default.").

Thus, *Johnson* provides limited guidance. By leaning on the word "external" and citing cases from the Third, Seventh, and Ninth Circuits, the Court of Appeals panel appears to signal that it will not entertain the notion that mental impairment can constitute cause. On the other hand, the Court does not categorically reject that notion and cites the Eighth Circuit, which has

---

[2] The District Court described Mr. Johnson as having "borderline mental retardation" because his IQ of 74 fell within the range of 70-85, which psychiatrists described as "borderline" prior to 1973. *Johnson v. Wilson*, No. 4:03-CV-1275-JRA, D.E. 36 at 11 (N.D. Ohio April 21, 2004). The District Court noted that "individuals in the so-called 'borderline retarded' group frequently did not function as mentally retarded people." *Id.*

11

found at least once that mental impairment could constitute cause. *See Holt v. Bowersox*, 191 F.3d 970, 974-75 (8th Cir. 1999).

In the wake of *Johnson*, district courts within the Sixth Circuit have faced numerous requests to find cause for procedural default based on mental impairment. The cases are split as to whether such claims should be denied on the basis that mental impairment is not "external" or whether the petitioner may succeed under the Eighth Circuit's "conclusive showing" standard.

The following District Courts in this Circuit appear to have held that, because mental impairments are not "external," they may not excuse procedural default:

- Eastern District of Michigan: *Caston v. Ludwick*, No. 2:07-CV-15299, 2008 WL 4185916, at *4 (E.D. Mich. Sept. 8, 2008) ("A habeas petitioner's mental impairment or limited intelligence level is not a factor that is external to the defense and therefore does not excuse a habeas petitioner's procedural default.").

- Northern District of Ohio: *Stanley v. Miller*, No. 15-CV-1576, 2018 WL 973921, at *5 (N.D. Ohio Feb. 20, 2018) (noting that in *Johnson*, the Sixth Circuit "rejected" intellectual disability as a factor "to establish cause"); *Crouse v. Bradshaw*, No. 1:12-CV-970, 2013 WL 5774702, at *13 (N.D. Ohio Oct. 23, 2013) (R&R) ("Petitioner's low IQ is not sufficient cause to excuse his procedural default."); *Sohrabi v. Richland Corr. Institutional Warden*, No. 12-CV-007, 2013 WL 3209533, at *13 (N.D. Ohio June 18, 2013) (finding that "low IQ" is a "borderline mental impairment" that cannot excuse default); *Womack v. Konteh*, No. 3:06-CV-157, 2008 WL 123867, at *3-4 (N.D. Ohio Jan. 10, 2008) (finding that an IQ of 69 is not an "external impediment" that may excuse default).

- Southern District of Ohio: *Doliboa v. Warden, U.S. Penitentiary*, No. 1:09-CV-872, 2010 WL 6111627, at *9 (S.D. Ohio Dec. 14, 2010) (finding that, even if Petitioner proved he suffered from "low IQ," this would not establish cause), *report and recommendation adopted*, 2011 WL 900965 (S.D. Ohio Mar. 14, 2011), *aff'd*, 503 F. App'x 358 (6th Cir. 2012); *Bevins v. Brunsman*, No. 1:08-CV-520, 2009 WL 5612338, at *10 (S.D. Ohio Dec. 17, 2009) (finding a "low IQ" insufficient to establish cause under *Johnson*), *report and recommendation adopted sub nom. Bevins v. Warden*, 2010 WL 338086 (S.D. Ohio Jan. 25, 2010).

- Eastern District of Kentucky: *Hickman v. Chandler*, No. 7:07-CV-169-ART-EBA, 2008 WL 2096373, at *5, *9-10 (E.D. Ky. May 16, 2008) (R&R) (finding a "low IQ (approximated at 77)" insufficient to excuse default under *Johnson*).

In contrast, the following District Courts in this Circuit have at least analyzed whether a petitioner may show cause under the Eighth Circuit's "conclusive showing" standard:

- Eastern District of Michigan: *Peterson v. Klee*, No. 2:12-CV-11109, 2015 WL 4389785, at *7-8 (E.D. Mich. July 15, 2015) ("Assuming that the Sixth Circuit would be willing to entertain the question of whether incompetence can constitute cause (as opposed to a borderline mental impairment), the Court is unable to conclude that Petitioner has made the 'conclusive' showing required by [*Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999)]."), *aff'd*, 655 F. App'x 327 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 1222 (2017).

- Northern District of Ohio: *Ream v. Bunting*, No. 3:15-CV-313, 2017 WL 7805229, at *14 (N.D. Ohio Apr. 12, 2017) (citing *Holt* and finding no factual basis to excuse default on account of mental illness), *report and recommendation*

*adopted*, 2018 WL 1083266 (N.D. Ohio Feb. 28, 2018); *Terry v. Warden*, No. 1:15-CV-2008, 2016 WL 5477552, at *12 (N.D. Ohio Mar. 3, 2016) (following *Peterson*, applying *Holt*, and finding no "conclusive" showing of severe mental impairment), *report and recommendation adopted sub nom. Terry v. Jackson*, 2016 WL 5462968 (N.D. Ohio Sept. 29, 2016).

- Southern District of Ohio: *Sudberry v. Voorhies*, No. 1:03-CV-537, 2008 WL 1905262, at *9 (S.D. Ohio Apr. 29, 2008) (finding no "conclusive showing" of sufficiently severe mental impairment under *Holt*); *Gibson v. Wolfe*, No. 2:04-CV-272, 2006 WL 1321023, at *1-2 (S.D. Ohio May 15, 2006) (same).

- Western District of Michigan: *Parker v. Howes*, No. 5:06-CV-178, 2009 WL 4639496, at *3 (W.D. Mich. Dec. 2, 2009) (finding no "conclusive showing" of sufficiently severe mental impairment under *Holt*); *Byrd v. Jones*, No. 1:04-CV-785, 2008 WL 151243, at *10 n.3 (W.D. Mich. Jan. 14, 2008) (same).

- Middle District of Tennessee: *Hamby v. Lee*, No. 3:17-CV-793, 2018 WL 274473, at *7-8 (M.D. Tenn. Jan. 2, 2018) (finding no "conclusive showing" of sufficiently severe mental impairment under *Holt*).

Given the many times this issue has arisen, it would be nice to have some clarity from the Sixth Circuit. In the absence of that clarity, this Court believes that an intellectual disability cannot provide cause to excuse procedural default because it is not an objective factor external to the defense. The Supreme Court in *Murray v. Carrier*, 477 U.S. 478 (1986), held that cause to excuse default "ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray*, 477 U.S. at 492. Although the *Murray* Court did not provide an exhaustive list of circumstances that could excuse default, the Court noted that

14

a factual or legal basis for a claim that was not reasonably available to counsel or interference by officials making compliance impracticable would qualify as external causes. *Id.* at 488. Additionally, "if the procedural default is the result of ineffective assistance of counsel" then cause would exist by operation of the Sixth Amendment. *Id.* The *Murray* Court compared ineffective assistance to "external" examples of cause, but it did not equate them. *Id.*

Intellectual disability is not external to the defense any more than is illiteracy or other functional limitation that exists due to a petitioner's personal characteristics. For example, a petitioner's *pro se* status, ignorance of the law, or unfamiliarity with the English language are not cause. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004). Similarly, illiteracy is insufficient to excuse default. *Cruz-Altunar v. Warden, Ross Corr. Inst.*, No. 2:14-CV-1844, 2016 WL 1449484, at *1 (S.D. Ohio Apr. 13, 2016) (citing *Weeks v. Bowersox*, 106 F.3d 248, 250 (8th Cir. 1997)), *appeal dismissed* (Aug. 16, 2016). Here, no external force or other independent obstacle acted in Stiltner's case to prevent a defense from being available to counsel. Nor is there any allegation that an official act prevented compliance. Thus, this Court finds that the intellectual disability at issue here was not an external objective factor that can serve as cause to excuse procedural default.

The presiding District Judge may disagree with this conclusion, so the Court will, in the alternative, apply the *Holt* formulation requiring a conclusive showing of interference. Applying the *Holt* standard, the Court must focus on the period during which Stiltner could have filed a timely post-conviction motion in the state courts. *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999). That period begins on May 8, 1986, the day after Stiltner's plea and sentencing. *See* D.E. 17-5 at 20.

Back then, Rule 11.42 had no timing requirement; Rule 11.42 motions could be filed "at any time." *See Haeberlin v. Sparkman*, 73 F.3d 362 (6th Cir. 1995); *Prater v. Com.*, 474 S.W.2d 383, 384 (Ky. 1971). The Rule's current three-year deadline became effective on October 1, 1994. *See Palmer v. Com.*, 3 S.W.3d 763, 764 (Ky. Ct. App. 1999).

The Court has found no authority detailing how the enactment of the three-year deadline affected old cases like Stiltner's. At most, his period for filing could have extended to three years past the Rule amendment's effective date, terminating on October 1, 1997. Therefore, in advance of the evidentiary hearing, the Court instructed Stiltner that, to establish cause to excuse default, he had to make a "conclusive showing" that mental illness interfered with his ability to appreciate his position and make rational decisions regarding his case during the entire period from May 8, 1986, to October 1, 1997. D.E. 115 at 11-12 (citing *Holt*, 191 F.3d at 974). Neither party objected to the application of this date range.

## D. The Sixth Circuit's Opinion Does Not Answer the Procedural Default Question

In its prior opinion in this case, the Court of Appeals found that equitable tolling of the federal habeas statute of limitations was warranted. *See* D.E. 99, *Stiltner v. Hart*, 657 F. App'x 513 (6th Cir. 2016). But this ruling does not dispose of the questions now before the Court.

The question before the Court of Appeals concerned whether Stiltner's intellectual deficiencies prevented him from filing a petition within the time allotted by the federal habeas corpus statute of limitations period, which, in this case, ran from April 24, 1996, to April 24, 1997. *Stiltner*, 657 F. App'x at 515. In conducting its analysis, the Court of Appeals affirmed this Court's finding that Stiltner was both unable to personally understand the need to timely file a habeas petition and was unable personally to prepare a habeas petition and effectuate its filing during the relevant period. *Id.* at 518, 522.

16

The appellate court described Stiltner as being "mentally incompetent" (*id.* at 519, 522) and suffering "mental incompetence" (*id.* at 520, 521) and "severe mental incompetence" (*id.* at 525). To be precise, this Court did not describe Stiltner as being "incompetent" or suffering "incompetence." Rather, this Court found that he was unable to personally understand the need to timely file a habeas petition and was unable personally to prepare a habeas petition and effectuate its filing during the relevant period. *See* D.E. 91 at 12 n.5, 16.

According to the Court of Appeals,

> The evidence in this case shows that Stiltner barely understood his claims, if he understood them at all. Drogin testified that Stiltner's IQ score on the WAIS was "within a range that is typically associated with what [clinical psychologists previously] called 'mental retardation' and currently refer to as 'intellectual disability.'" R. 84 [at 15]. The evidence demonstrates that this intellectual disability is severe. In addition to being unable to read or write, Stiltner has an extremely poor memory, an attention span of "seconds," and significant difficulty organizing his thoughts and understanding even simple logical relationships. *Id.* at 28, 34-35, 71, 75-76, 96, 100. . . Stiltner is also severely limited in his ability to process language.

*Stiltner*, 657 F. App'x at 523. The appellate court majority found he "could barely understand the need for legal assistance, let alone monitor that assistance." *Id.* at 525.

Because the procedural default question concerned a broader time frame and a different legal standard, a new evidentiary hearing was necessary. In the interest of efficiency, the hearing encompassed both the procedural default issue and the merits of Stiltner's claim. D.E. 115. The hearing also generated significant new written evidence, including a new forensic evaluation of Stiltner and additional records from the past.

### III.  Applicable Legal Standards

As explained in Section II, assuming that mental deficiencies can provide a basis to overcome procedural default, to overcome default, Stiltner must make "a conclusive showing" that mental illness interfered with his ability to appreciate his position and make rational

17

decisions regarding his case at the time during which he should have pursued post-conviction relief—May 8, 1986, to October 1, 1997.  *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999).

If he overcomes procedural default, to succeed on his IAC claim, Stiltner must prove both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).  To prove prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  Stiltner argues that his counsel was ineffective "for failing to raise the mental retardation defense."  D.E. 17 at 3. Accordingly, to prove his claim, he must show that any incompetency defense raised in May 1986 would have had a reasonable probability of success.  Of course, the success of any competency defense would depend on whether Stiltner, at that time, satisfied the standard of *Dusky*.  Is there a reasonable probability that a court, at that time, would have found that Stiltner possessed "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him"?  *Dusky v. United States*, 362 U.S. 402 (1960).  Any review of this *Strickland* question would be *de novo* because the state courts never addressed the merits of Stiltner's claim. In other words, there is no prior ruling to which this Court could apply AEDPA deference. *Robinson v. Howes*, 663 F.3d 819, 822-23 (6th Cir. 2011).

On the question of his competency in 1986, Stiltner bears a heavy evidentiary burden. First, "Criminal law presumes that individuals are competent . . . and a finding of competence, once made, continues to be presumptively correct until some good reason to doubt it is presented."  *Garrett v. Groose*, 99 F.3d 283, 286 (8th Cir. 1996).  "[T]here is a general presumption—in the absence of evidence to the contrary—that every defendant is competent to

18

stand trial." *Short v. Com.*, No. 2013-SC-755-MR, 2015 WL 3631671, at *2 (Ky. June 11, 2015).

Second, in addition to the presumption of competency, Stiltner must reckon with the fact that the state court that took his guilty plea in 1986 found him competent to do so.  In its Judgment on Guilty Plea and Final Sentence of Imprisonment, the Fayette Circuit Court found that Stiltner

> understands the nature of the charges against him, that the defendant understands the elements of the charge(s) against him and elements of any lesser included offenses and any defenses available to him at trial, that the defendant's plea is voluntary, that the defendant knowingly and voluntarily waives his right to trial by jury[,] privilege against self-incrimination and right of confrontation. . . . [Further,] the defendant's waiver [of his right to a presentence investigation report and hearing] was made knowingly and voluntarily.

D.E. 1-3 at 4-5.  This ruling came in conjunction with trial counsel's certified statement that Stiltner's plea was "voluntarily and understandingly made."  *Id*. at 3.  In ruling on Stiltner's 60.02 motion, the Kentucky Court of Appeals also stated, "There is nothing in the record to indicate that at the time of his guilty plea that Stiltner was suffering from any kind of mental illness, disease or defect."  D.E. 10-6 at 26.

Another court's finding of competency is question of fact that is presumed correct unless shown to be clearly erroneous.  *See Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005) ("A defendant's competence is a question of fact, which we review for clear error."); *Finley v. Rogers*, 116 F. App'x 630, 635 (6th Cir. 2004) ("The question whether a defendant is competent to stand trial . . . is a question of fact for purposes of the AEDPA."); *Mackey v. Dutton*, 217 F.3d 399, 412 (6th Cir. 2000) ("Today we hold that, pursuant to recent Supreme Court precedent, the competency determination should be treated as a question of fact for purposes of § 2254(d).").

Finally, courts have observed that "[r]etroactive determinations of competency are difficult [to prove], and any such determination must be based on 'evidence derived from knowledge contemporaneous to trial.'" *Eley v. Bagley*, 604 F.3d 958, 967 (6th Cir. 2010) (quoting *Conner v. Wingo,* 429 F.2d 630, 637 (6th Cir. 1970)).  The Court in *Eley* found that competency evidence collected ten years after trial had "virtually no probative value."  *Id.* Similarly, the court in *Harries* found that psychological opinions rendered three and nineteen years post-trial had diminished relevance.  *Harries*, 417 F.3d at 636.  A similar problem arose in *Black*:

> Black argues that neither his experts nor the State's experts conducted a thorough evaluation of either his social history or his psychological and neurological impairments in assessing his competency to stand trial.  But Black relies on evidence from his post-conviction proceedings, which was produced long after his trial, in order to support this claim.  Although such after-the-fact evidence is relevant to competency determinations, "[t]he critical question is whether the evidence relied upon for determining a defendant's competence at an earlier time of trial was evidence derived from knowledge contemporaneous to trial."  *Bowers v. Battles*, 568 F.2d 1, 4 (6th Cir. 1977) (internal quotation marks omitted).  Psychiatric opinions offered years after a habeas petitioner's trial are therefore not nearly as relevant as those issued at the time of trial.  *Harries v. Bell*, 417 F.3d 631, 636 (6th Cir. 2005).

*Black v. Bell*, 664 F.3d 81, 101-02 (6th Cir. 2011).

With these standards in mind, the Court now turns to the available evidence.

## IV.  Evidence Concerning Stilner's Mental Health

### A.  Pre-1986 Records

The first category of evidence includes mental health records that predate Stiltner's 1986 guilty plea to murder.  The earliest records come from Eastern State Hospital in 1959.  Stiltner, then fourteen years old, had been referred for examination after he was "found to be in a disturbed mental condition" during a criminal hearing for molesting and killing his two-year-old niece.  D.E. 86-1 at 2.  The first physician who saw Stiltner noted a tentative diagnosis of

"Inadequate personality with sexual deviation." *Id*. Stiltner reported hearing voices, including those of "God and the Devil." *Id*. at 3. Shortly thereafter, a second physician at Eastern State conducted a psychological evaluation and offered a diagnosis of "Mental Deficiency, Idiopathic, Moderate with Psychosic Reaction." *Id*. at 4. A third physician remarked that Stiltner was "found to be psychotic," and offered a diagnosis of "schizophrenic reaction, childhood type." *Id*.

A fourth physician estimated Stiltner's IQ to be 71. D.E. 86-1 at 5. He noted the "staff" agreed with the second physician's diagnosis. *Id*. This opinion appears to have been based on testing which yielded "an estimated I.Q. of 71 . . . placing the patient in the mildly mentally defective range." *Id*. at 8. "In summary, the test findings are more suggestive of a Schizophrenic Reaction in a person who is mildly mentally defective." *Id*. In 1961, a Doctor Elequin at Eastern State found Stiltner to be "not psychotic at the present time, but basically mental defective." *Id*. at 6.

In 1961, Stiltner was transferred to Central State and assigned a tentative diagnosis of "schizoid personality." D.E. 86-1 at 7; D.E. 86-2 at 3. He was described as "dull" and of "below average" intelligence. D.E. 86-2 at 3.

In February 1961, fifteen-year-old Stiltner received another psychological examination. D.E. 86-2 at 4. He "achieved a performance scale I.Q. of 68 on the Weschler Scale. His score on the Raven Test would give him an I.Q. approximately 54." *Id*. Based on these scores and the 71 I.Q. determined at Eastern State, Stiltner was described as "definitely mentally defective," or "well within the mental defective range in terms of psychiatric nomenclature." *Id*. He presented "a more or less uncomplicated case of mental deficiency." *Id*. The assigned diagnosis was "Moderate mental deficient intelligence, sociopathic personality pattern." *Id*. at 5. Stiltner was "functioning in the upper reaches of the 'definite mental defective' range of intelligence" with

21

"no clear-cut evidences of" schizophrenia or "organic brain disturbance." *Id.* He was discharged back to Eastern State from Central State on March 21, 1961. *Id.* at 6-7.

In February 1964, Stiltner received another psychological evaluation. D.E. 86-3 at 2. The Weschler intelligence test yielded "a verbal I.Q. of 68, a performance I.Q. of 81, and a full scale score of 72." *Id.* The examiner considered these scores to be "probably indicative of dull normal intelligence," given Stiltner's lack of education. *Id.*

Stiltner received another diagnosis in 1965. Based on his prior evaluations and subsequent observation, a Dr. Roubal at Eastern State diagnosed Stiltner with "mental deficiency, mild, with behavioral reaction." D.E. 86-4 at 2. In July 1965, Stiltner was released from Eastern State on account of his "AWOL status" after several escapes, the last of which culminated in his arrest on new criminal charges. *Id.* at 4.

The Warden points out two instances prior to Stiltner's 1986 plea in which he was found competent to stand trial. D.E. 173 at 53-56. The first competency finding flows from the charges and mental health commitment discussed above. Defense Exhibit 10 from the recent hearings indicates that Stiltner had pleaded not guilty by reason of insanity to a charge of willful murder in case number 8712. Among the associated documents is an April 1, 1964 letter from Dr. Champ Ligon of Eastern State Hospital to Judge F. P. Keesee. D.E. 179. It states, in part:

> Mr. Roy Stiltner is a 19 year old white male, who has been committed to two mental hospitals, Central State Hospital, and Eastern State Hospital, since 1959. He was sent to these hospitals after he had murdered the two year old daughter of his aunt and uncle. A Staff Conference of physicians at Eastern State Hospital held on March 30, 1964 determined that he was not psychotic and *could be returned to your court for trial*. In view of the long period of hospitalization during which at times he has been considered insane and at other times not insane, it is our opinion that rehabilitation efforts might be undertaken in lieu of returning him to trial.

> . . . . At the present time, he does not belong in a mental hospital . . . . We are not set up as a prison and it is not a good policy to keep a well person in the sick ward around psychotic people. . . .

*Id*. (emphasis added). The letter goes on to recommend that Stiltner be placed in a job outside the hospital, and requests "a release or dismissal of charges" from the court to make this possible. "The alternative, as previously stated, is to send him back for trial." *Id*. Perhaps most significant for the present determination is the Staff Conference's decision that Stiltner could return to court for trial, a statement tantamount to a finding of competency.

The second pre-1986 finding of competency concerns Fayette Circuit Court case number 76-C-196, which is also among the criminal records contained in defense Exhibit 10 from the recent hearings. According to these records, Stiltner pleaded guilty to second-degree escape, and the court accepted the plea as knowing and voluntary. However, the court ordered a psychological evaluation between the plea and sentencing. D.E. 180. The subsequent one-page report by Dr. Pedro Ruiz concludes, "Mr. Stiltner can stand trial." D.E. 181. The report observes, "Intellectually he functions below average; nevertheless, it does not seem to be secondary to brain damage or other types of organic disturbances. He does not seem to suffer from any of the major 'functional' psychiatric disorders." *Id*. Stiltner was then sentenced.

The parties also deposed Judge Kim Wilkie on December 4, 2017, and entered a video recording of the deposition as a conventional filing. D.E. 156. Judge Wilkie represented Stiltner in 1984 in a case that resulted in a guilty plea to burglary in exchange for a one-year sentence—Stiltner's last case prior to his 1986 murder conviction. *See* D.E. 173 at 9. At the time of the plea, Judge Wilkie signed a certification that Stiltner understood the plea. Although he had little memory of Stiltner's case, he testified that it "never occurred" to him that Stiltner might have

been incompetent. *See id*. at 10; D.E. 156. Thus, Judge Wilkie's 2017 testimony provides some insight into Stiltner's functioning near the time of his 1986 plea.

## B. 1986 Records

The second category of evidence consists of documents produced in conjunction with Stiltner's 1986 prosecution and challenged conviction for the murder of Robert Pollard. Along with his habeas petition, Stiltner submitted an uncertified transcript of a police interview conducted March 6, 1986. D.E. 1-10. In the interview, Stiltner initially denies shooting Pollard, but then admits it once he is told that other witnesses identified him as the shooter. *Id*. at 3-5, 8-9. He describes the circumstances of the killing. *Id*. at 8-12, 14. He describes how he became "scared" and started walking along a railroad track from Lexington to Louisville. *Id*. at 2, 6. He describes how he hid his rifle in a sinkhole and covered it with "some plastic stuff." *Id*. at 9. He describes how he decided to turn around and turn himself in. *Id*. at 2, 6. He made this decision after he "sat down and tried to study out what best thing would be to do." *Id*. at 13.

At the latest evidentiary hearing, the psychologist who recently evaluated Stiltner characterized this interview as "the best document we have" for judging Stiltner's competence at the time of his plea because the interview happened shortly after the murder. D.E. 169 at 62. Defense counsel has pointed out that the transcript is not certified. *Id*. at 50. Although Dr. Williams relied on the transcript to some extent (D.E. 182 at 2, 11), the Court will not give it much independent weight. It does, however, provide useful context.

There are also court documents dating from this time. As has been noted, Stiltner's trial counsel signed a "Certificate of Counsel" in conjunction with the guilty plea. D.E. 1-3 at 3. Counsel certified, among other things, that Stiltner's guilty plea "is voluntarily and understandingly made." *Id*. Then, in its Judgment order, the Court found

24

that the defendant understands the nature of the charges against him, that the defendant understands the elements of the charge(s) against him and elements of any lesser included offenses and any defenses available to him at trial, that the defendant's plea is voluntary, that the defendant knowingly and voluntarily waives his right to trial by jury[,] privilege against self-incrimination[,] and right of confrontation, and that there is a factual basis for the defendant's plea.

*Id*. at 4-5.

Shortly after Stiltner's plea and sentencing, a presentence investigation report was produced. D.E. 43-1. This document noted that Stiltner had previously been committed to Eastern State Hospital. *Id*. at 7. It said, "Initial diagnosis indicated schizophrenia—childhood type. Later diagnosis indicated mental deficiency, mild, with behavioral reactions. Subject[']s IQ level was 71." *Id*. The report concluded, "It is the opinion of this Officer that subject is in need of psychological evaluation." *Id*. at 8. There is no evidence in the record that this recommended evaluation ever took place.

### C. Dr. Drogin's Evaluation

Chronologically, the next available relevant evidence does not emerge until 2006. Dennis Burke of the Department of Public Advocacy asked psychologist Eric Y. Drogin to conduct an initial examination of Stiltner. This is the third category of evidence.

Dr. Drogin is a clinical and forensic psychologist who also obtained a law degree from Villanova. D.E. 1-6; D.E. 84 at. 10. On September 7, 2006, he conducted an "initial examination" of Stiltner. D.E. 1-6; 84 at 11. Dr. Drogin summarized his tentative findings in a letter dated September 15, 2006. D.E. 1-6. "As measured with the *Wechsler Adult Intelligence Scale*," Dr. Drogin reported, "Mr. Stiltner's Full Scale IQ was 62, with a Verbal IQ of 64 and a Performance IQ of 65. Such results rest within a range of functioning typically associated with Mental Retardation. Supplemental test results were consistent with these outcomes." *Id*. Dr. Drogin suggested that

Such levels of cognitive impairment may significantly interfere with a defendant's capacity to appreciate the nature and consequences of the proceedings against him, or to participate rationally in his own defense. It will be important to obtain further documentation of your client's intellectual and behavioral functioning over time, in order to arrive at any further conclusions concerning his ability to participate in plea negotiations during the period in question.

*Id.*

In 2015, Dr. Drogin testified at a hearing in an earlier phase of this federal case. In his testimony he reviewed the tests he had given Stiltner in 2006. He explained they indicated Stiltner had "diminished cognitive capacity" and "poor short-term memory performance," which he deemed "particularly striking." D.E. 84 at 28. Dr. Drogin was careful to explain that his interaction with Stiltner "never ripened into a full-blown evaluation." *Id.* at 45. He "did not conduct a clinical and forensic interview," *id.*, and he had "not diagnosed Mr. Stiltner with anything," *id.* at 49.

### D.  May 2015 Evidentiary Hearing

The fourth category of evidence consists of the testimony given at the 2015 evidentiary hearing in addition to Dr. Drogin's statements. The probative value of this evidence is limited because the question before the Court was different, *i.e.*, whether Stiltner's intellectual impairments warranted equitable tolling of the habeas corpus statute of limitations.

One witness, David Blair, testified that he shared a room with Stiltner from 1994 to 1998. D.E. 84 at 65. He also saw Stiltner sporadically from 2002 to 2003 or 2004. *Id.* Blair did the legal work that resulted in the filing of Stiltner's December 2004 Rule 11.42 motion. *Id.* at 67-69. Blair described Stiltner as a simpleton, someone with the intellect of a two-year-old or five-year-old child. *Id.* at 82. He said Stiltner had a very short attention span and seemed uninterested in discussing his case and incapable of understanding legal processes and procedural

26

requirements.  *Id*. at 74-76.  Blair explained that Stiltner had little interest or comprehension regarding his legal filings, and never told him what to do in relation to his case.  *Id*. at 70-76.

The next witness was fellow-inmate Scot Gaither, who filed Stiltner's 2013 federal habeas petition and his Rule 60.02 motion.  D.E. 84 at 88, 90, 101-02.  Gaither testified that he met Stiltner in 2010, and eventually took over Stiltner's case from Stiltner's previous roommate, Tim Fancher.  *Id*. at 89.  According to Gaither, Stiltner never directed him to do anything and did not seem to understand what Gaither was doing regarding his case.  *Id*. at 92, 95.  Gaither testified that Stiltner was so intellectually handicapped and had such poor memory that he could not even order items from the prison commissary without help from another inmate.  *Id*. at 94.  The process involved filling out a simple form, but Stiltner, after years of ordering the same thing every time, could not complete the form without assistance.  *Id*. at 112-13.  Gaither said Stiltner reminded him of an eight-year-old child "on some days" and "about a four-year-old child" on other days.  *Id*. at 96.

Stiltner also testified at the 2015 hearing.  He did not recall David Blair or Tim Fancher filing anything on his behalf, and said that "maybe" Scot Gaither had.  D.E. 84 at 129.  He did not recall ever meeting with an attorney since his incarceration.  *Id*. at 137-38.

### E.  Russell Williams's Evaluation & Testimony

The fifth category of evidence consists of the psychological evaluation performed by Dr. Russell H. Williams on September 25, 2017, in anticipation of the most recent evidentiary hearing.  Dr. Williams issued a competency report on October 24, 2017.  D.E. 182.  Dr. Williams defined the scope of his inquiry:

> The court order directed that Mr. Stiltner be evaluated for the purpose of determining his competency to stand trial for the offense for which he had entered his plea of guilty in 1986, as well as address the issue related to the potential that mental illness interfered with his ability to appreciate his position and make

rational decisions regarding his case during the entire period from May 8, 1986, to October 1, 1997. Thus, the current evaluation is a retrospective evaluation of his competency in 1986, and his decisional capacity for the period of May 1986 to October 1997.

*Id*. at 1. To this end, Dr. Williams spent four hours testing and interviewing Stiltner. *Id*. at 2. Dr. Williams also reviewed numerous records, which the report lists on page 2. Dr. Williams describes Stiltner as "pleasant" and "alert and oriented" throughout the interview. *Id*. Stiltner "did not present with any psychiatric or behavior disturbances." *Id*. Stiltner described his work history in the Department of Corrections ("DOC") and explained that other inmates helped him with reading and writing. *Id*. at 3. Dr. Williams remarked that Stiltner's "general intellect and vocabulary appeared commensurate with his self-report." *Id*. Stiltner "reported difficulties with his memory." *Id*. at 7. Dr. Williams judged his intellectual status "to be in the lower extreme range," and his "immediate, recent, and remote memory was found to be intact." *Id*. Dr. Williams described Stiltner's thought process as "logical, sequential, and goal oriented." *Id*.

However, Dr. Williams suspected that Stiltner was not giving full effort during his testing. He noted that Stiltner's "effort on psychological tests . . . was <u>varied</u>." D.E. 182 at 7. Although Dr. Williams felt his test results are "an adequate representation" of Stiltner's present level of functioning, the results "could possibly be an underrepresentation of his true ability." *Id*. For example, Stiltner performed much more poorly on the Rey Memorization test for Dr. Williams (scoring two out of fifteen items) than he did for Dr. Drogin (scoring eleven out of fifteen). *Id*. Stiltner was also given a test to detect malingering, and his score of 36 was "elevated above the recommended cutoff score (14) for the identification of suspected malingering." *Id*. at 10. Stiltner "endorsed a high frequency of symptoms that are highly atypical in patients with genuine psychiatric or cognitive disorders . . . it is felt that his overall

effort and commitment on his evaluations may not have been as forthcoming as it could have been." *Id*.

Dr. Williams reviewed prior psychological evaluations, specifically ones from 1959, 1961, 1966, and 2006, that were previously discussed. D.E. 182 at 3-4. He also reviewed Stiltner's larger history of institutionalizations. *Id*. at 5. Dr. Williams found only one "unremarkable" mental-health related contact in Stiltner's DOC records. *Id*. at 4.

Based on his own testing, Dr. Williams obtained a full-scale IQ score of 66 for Stiltner, "with a 90% likelihood of falling between 62 and 72." D.E. 182 at 8. This finding, he noted, is "consistent" with Stiltner's past scores. *Id*. One test, which evaluates visual motor integration, rendered a score that was possibly indicative of "organic-based neurological deficits." *Id*. at 9.

Specifically concerning competence to stand trial, Stiltner was tested with the Inventory of Legal Knowledge. D.E. 182 at 11. Stiltner's score of 51 "is similar to the mean ILK Total scores produced by defendants who, in the opinion of their examiners, were competent to proceed (i.e. 50.42 and above). Defendants opined as incompetent to proceed on average scored 40.59 or below." *Id*. Stiltner was also given the Competence Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR"):

> He received a score of 19 out of 25 (76%) on the Basic Legal Concepts, a score of 11 out of 15 (73%) on Skills to Assist Defense, and a score of 8 out of 10 (80%) on Understanding Case Events. These scores are congruent with examinees found to be competent to stand trial. More specifically, defendants with mental retardation, who were opined as competent to proceed, received mean scores of 18.3 on Section I, 10.7 on Section II, and 8.0 on Section Ill. Defendants with mental retardation in the standardized sample, who were judged not-competent, received a mean score of 12.3 on Section I, 8.2 on Section II, and 5.2 on Section III. Mr. Stiltner's scores fall well above the mean scores for defendants opined as not competent.

*Id*.

Concerning his ultimate opinion, Dr. Williams opined, "there does not appear to be any significant decline in Mr. Stiltner's overall cognitive capacity since 1986." D.E. 182 at 13. His IQ scores had mostly "remained static over time, with his first assessment in 1959 (IQ=71) being congruent with testing conducted in 2017 (IQ=66). Additionally, there is no evidence of acute organicity beyond what was found prior to 1986." *Id.* Dr. Williams said that one could conclude from these findings "that Mr. Stiltner's cognitive capacity today is parallel and equally preserved to that which he had in 1986, as well as during the time period of May 1986 to October 1997." *Id.* Stiltner also demonstrated "a foundational understanding of Basic Legal Concepts, Skills to Assist Defense, Knowledge of Case Events (specific to his alleged crime), and decisional capacity to make informed judgements and conform to his immediate environment." *Id.* On top of this, Stiltner has "an extensive history of engagement with the legal system" prior to his 1986 guilty plea, even to the extent that he was classified as a persistent felony offender. *Id.* at 13-14.

It was Dr. Williams's opinion that Stiltner met the applicable legal competency standards "in 1986, as well as he would today." D.E. 182 at 14. Specifically,

> after an exhaustive review of Mr. Stiltner's medical, psychological, and legal history, this evaluator uncovered nothing in the record to suggest at the time of his guilty plea in 1986 that Mr. Stiltner was suffering from any kind of mental illness, disease, or defect that would cause him to be incapacitated. To the contrary, he was on two prior occasions to 1986, found to be competent to go to trial.

*Id.*

However, when it came to the procedural default question and the *Holt* standard, Dr. Williams was "divided." D.E. 182 at 14. On one hand, Stiltner's "demonstrated intellectual deficit[] most likely interferes with his ability to 'appreciate his position' as it relates to time and learning. Mr. Stiltner is prone to 'live in the moment' rather than to be reflective and planning. His forethought is poorly established." *Id.* at 15. On the other hand, there was "no evidence in

30

the record or through direct interview of Mr. Stiltner, to support the [tenant] that his 'mental illness (intellectual deficit)' interferes with his ability to make rational decisions."[3]  *Id*. Accordingly, the *Holt* standard "cannot be supported in its entirety, and thus is unfounded." *Id*.

Accordingly, the findings of Dr. Williams's report suggest that Stiltner has not met his burden on either the merits of his habeas petition or the procedural default issue.

Dr. Williams underwent direct examination during the first portion of the evidentiary hearing, on December 12, 2017.  *See* D.E. 164 at 181-249.  In addition to the report, Dr. Williams's raw data from the testing was admitted as an exhibit and he was examined on the data's contents.  *See id*. at 243.

Dr. Williams's testimony revealed that he was uniquely well-qualified to perform the evaluation in this case.  During the seventeen years that he has been licensed, he had performed 300 to 500 competency and sanity evaluations.  D.E. 169 at 86.  "I've probably rendered around 450 reports regarding competency criminal responsibility matters."  D.E. 164 at 183.  Dr. Williams testified that about 30% of his competency evaluations result in a finding of incompetence.  *Id*. at 184.

Dr. Williams further explained that he began working for the Kentucky Correctional Psychiatric Center ("KCPC") in 2005.  D.E. 164 at 182.  After four years, he was promoted to

---

[3] According to the report, the following facts were indicative of Stiltner's ability to make rational decisions despite his intellectual deficits:

> [Stiltner] had (1) consistently held employment with the DOC during the time period outlined, (2) received a pay raise based on the merit of his demonstrated work conviction, (3) participated in the DOC self-medication program, (4) received a total of two disciplinary write ups during the said time period (even while serving time in one of the DOC most difficult institutions), (5) met with the Parole Board in 1994, and stated he expected a "deferment, not a serve out", (6) successfully filed for a Parole Board reconsideration hearing, (7) consulted with Tina Scott, paralegal post-conviction, and sign releases in order to begin the process for his appeal prior to October 1997 deadline, (8) because of his "clear conduct" was granted a reclassification, and (9) was granted Honor Dorm status based on his clear conduct status.

D.E. 182 at 15.

the director of psychology at Central State Hospital, and then to clinical director at Central State until 2010. *Id.* During these periods, Dr. Williams performed competency evaluations and oversaw other psychologists who did competency evaluations. *Id.* Since 2011, he has done competency and sanity evaluations in his private practice. *Id.* at 183.

Dr. Williams testified that Stiltner's IQ tests all fell within the 62-72 "confidence interval," except for one score of 81, which was an outlier.[4] *Id.* at 220. Accordingly, Stiltner's intelligence was "static" from 1959 to 2017; his "general intelligence" had not declined. *Id.* But nothing in his history indicated he had ever functioned above this "well below average" range. *Id.* at 221. There was "no indication" that his intellectual functioning "has changed since his initial testing in 1959." *Id.* at 239.

Dr. Williams clarified his position in regard to malingering: "There's no part of me that thinks that Roy sits and tries to malinger. . . . But I think that there is some exaggeration and some maybe not [being] forthcoming with information, based on the SIMS and his Rey 15." D.E. 164 at 224-25. Dr. Williams later explained that malingering is indicative of neither competence nor incompetence.

Dr. Williams concluded, "I feel within a reasonable degree of psychological certainty that Mr. Stiltner was competent in 1986, as he is today." D.E. 164 at 240.

The evidentiary hearing was reconvened on January 22, 2018, and Dr. Williams was cross-examined by Stiltner's counsel. D.E. 169 at 12-89. Dr. Williams testified that this was his first retrospective competency evaluation. *Id.* at 33. He clarified that he consulted with no one besides Stiltner. *Id.* at 32. Nevertheless, Dr. Williams felt "very confident" in his opinion, based on the records and testing. *Id.* at 33. Dr. Williams testified that among the materials he reviewed

---

[4] Stiltner's records contain a "Raven" test score indicating an IQ of 54. D.E. 86-2 at 4. Dr. Williams was not trained to give the Raven's test and did not factor this score into his analysis. D.E. 169 at 41, 75-76.

were the transcript of the 2015 hearing and the Sixth Circuit's opinion in this case. *Id*. at 33; 39-40. Concerning the Sixth Circuit's finding of "incompetency," he stated, "my opinion is different than theirs." *Id*. at 40. He reiterated that, while "[c]ompetency is fluid" and an incompetent person may have "lucid intervals," intellectual disability "is for life." *Id*. at 44.

On redirect, Dr. Williams opined that "the good thing with Mr. Stiltner is we have really good testing across the timeline," and the testing contained no indication of mental decline, even though one might expect to see it in someone older than 75. D.E. 169 at 74. He testified that the record he reviewed in this case was "very well developed." *Id*. at 86. In terms of the volume of information available to inform his evaluation, Stiltner's case "was in the top 5 percent . . . it was nice." *Id*. He also had no problem holding Stiltner's attention for the four hours of testing and interviews. *Id*. at 78.

Dr. Williams was asked how much weight he would assign to the reporting of other inmates (such as the ones who testified at the hearings). D.E. 169 at 78. He did not consider the inmates' reports especially helpful. *Id*. at 78-80. On one hand, we already know about Stiltner's intellectual deficits. *Id*. at 79. On the other hand, their characterization of Stiltner as helpless was inconsistent with other available information. Specifically, Stiltner's record of relative success in prison was different from what one typically sees with intellectually disadvantaged prisoners. *Id*. at 79-80. Unlike other intellectually challenged prisoners, Stiltner does not have a history of being preyed upon by other inmates, being in trouble, or being unable to keep a steady prison job. *Id*. And, Stiltner did all this in one of the more "difficult" institutions—"at the prisons where people are asking to get out of, and he's comfortable there." *Id*. at 80. These facts all speak "to the sophistication of his time in the Department of Corrections." *Id*. He was never sent to Kentucky State Reformatory ("KSR"), where inmates "with intellectual disabilities are

33

housed and protected." *Id*. Nor was Stiltner ever on Dr. Williams's "radar" when he was director of the Correctional Psychiatric Treatment Unit, which is headquartered at KSR. *Id*.; D.E. 164 at 201. It was surprising that Stiltner's records contain "no indication of him being referred to KSR, which is where they house individuals that have mental health issues, physical health issues, or a lower intelligence." D.E. 164 at 201. KSR has a facility dedicated to inmates who function below a 70 IQ, but Stiltner was never referred there. *Id*. at 202.

Dr. Williams considered Stiltner's criminal history relevant. He noted in his report that "between the years of 1965 to 1984, Mr. Stiltner appears to have been present in Fayette District Court no fewer than 44 times for disposition on misdemeanor motions, and no fewer than 3 times in Fayette Circuit Court on felony [charges]." D.E. 182 at 13-14. Stiltner also entered three separate guilty pleas on felony charges. *Id*. at 14. Dr. Williams explained at the hearing that these numbers were telling because, even in misdemeanor prosecutions, "if there's an issue of competence, that issue is going to be raised." D.E. 169 at 88. Dr. Williams said that about 30% to 40% of the competency and sanity evaluations he had performed had been in non-felony cases. *Id*. "[C]ompetency can be raised by the Judge, the prosecution, [and the] defense," but such did not happen in the majority of Stiltner's cases. *Id*.

## F. 2017-2018 Evidentiary Hearing

The sixth category of evidence consists of the remaining testimony and exhibits presented at the most recent evidentiary hearing, meaning other than Dr. Williams's testimony. The hearing was split over two days in December 2017 and January 2018. D.E. 158, 166. Nine witnesses testified besides Dr. Williams. D.E. 158. Dr. Drogin was present during the December 2017 hearing, but he did not testify. The parties told the Court they had hoped Stiltner's 1986 trial counsel, Gene Lewter, could be called as a witness. D.E. 164 at 4.

34

However, they were unable to contact Mr. Lewter and heard from other sources that Mr. Lewter is in a nursing facility and suffering from "cognitive disfunction." *Id*. at 5. To the Court's knowledge, Mr. Lewter has not been involved or consulted in relation to Stiltner's habeas petition.

The first four witnesses were inmates who had known Stiltner since the 1980s. The first, Darrell Barlow Anderson, had seen Stiltner "off and on" from 1987 to the present. D.E. 164 at 10. The second, George Edwin McGinnis, had seen Stiltner off and on from 1989. *Id*. at 22, 28. The third, James Allen Dixon, had seen Stiltner off and on from "[t]owards the end of the '80s." *Id*. at 50-51. The fourth, Robert Arnold Smith, had met Stiltner in 1986, and they had spent a lot of time in the same institutions. *Id*. at 54, 61-62. These witnesses' testimony is summarized in Stiltner's post-hearing brief. D.E. 170 at 1-6. The essence of these four witnesses' testimony is that Stiltner has a child-like mentality. He cannot read or write, has a poor memory, and does little rational thinking. A group of inmates, including these four witnesses, has been helping and protecting Stiltner throughout his entire incarceration. They assist him, for example, in filling out his commissary orders, taking his medication, and ensuring he gets paid for the time he works in the kitchen.

The next testimony came from retired attorney Timothy Riddell. Mr. Riddell used to work for the Department of Public Advocacy ("DPA"). For a time, he went to Eastern Kentucky Correctional Complex every Wednesday to consult with inmates about prison issues and postconviction motions. D.E. 164 at 78-79, 92. He was "not sure" he had ever met Stiltner, who was in that institution at the time. *Id*. at 79. Mr. Riddell would be "stationed in the library" to meet inmates, and he "just remember[s] Mr. Stiltner's face;" he is "not sure" they ever spoke. *Id*. Mr. Riddell "apparently" printed his name on a document requesting Stiltner's medical

records from Eastern State Hospital. *Id*. He did not remember doing this "at all." *Id*. He did not follow up on the request because it "fell off [his] radar" because Stiltner was not a "squeaky wheel" who demanded attention. *Id*. at 79-80. Thus, Mr. Riddell's testimony clarified the background to the 1996 and 1997 medical release forms that bear his name. D.E. 90.

The sixth witness was Dennis Burke, who has worked for the DPA since 1998. He was involved in Stiltner's case in 2005 or 2006. D.E. 164 at 103-04. Mr. Burke requested Stiltner's Eastern State and Western State records, but it took months to obtain them. *Id*. at 104. He also obtained the police report and Fayette Circuit Court records associated with Stiltner's murder conviction. *Id*. at 105. Mr. Burke testified that he hired Dr. Drogin to perform the preliminary psychological review of Stiltner. *Id*. at 107.

Stiltner's counsel asked Mr. Burke his opinions about events related to Stiltner's 1986 guilty plea. Mr. Burke testified that it was odd for Stiltner to plead guilty to murder without negotiating a recommended sentence with the prosecution. D.E. 164 at 110-11. Instead, Stiltner "did an open plea and the Commonwealth recommended the maximum, and then the judge accepted that." *Id*. at 110. Mr. Burke testified that, had Stiltner proceeded to trial, he could have conceivably pursued self-defense, diminished capacity, or a lesser included offense to murder— any of which could have garnered a lesser sentence. *Id*. at 112-13.

Mr. Burke testified that the three-and-a-half weeks between the indictment and the guilty plea would not have provided sufficient time for Stiltner's attorney to adequately investigate the case. D.E. 164 at 113-14. "Three weeks would probably be not enough time to investigate a DUI . . . much less a murder." *Id*. at 114. Mr. Burke found no evidence that plea negotiations had taken place because an open plea with the maximum penalty was the "worst possible" option. *Id*. Mr. Burke opined that Stiltner's counsel should not have advised Stiltner to enter an

open plea because it did not appear to him that an adequate investigation had been conducted at that point. *Id*. at 115-16. He testified that Stiltner's file caught his eye because he considered it "unheard of" and "outrageous" that Stiltner had pleaded guilty to murder so soon after being indicted. *Id*. at 118. Mr. Burke's opinion was that Stiltner had not received effective assistance. *Id*. On cross examination, Mr. Burke admitted that if Stiltner had received a lesser-included conviction of first-degree manslaughter along with persistent felony offender, he still would have faced a sentence of twenty years to life. *Id*. at 131. Mr. Burke agreed that, prior to 1986, Stiltner was arrested and then pleaded guilty within a short period of time, even on felony charges. *Id*. at 132. Mr. Burke suggested this indicates Stiltner has been "underrepresentend" during his entire criminal justice experience. *Id*.

Stiltner's counsel also asked Mr. Burke about Stiltner's presentence report, which was produced after Stiltner's sentencing and judgment. D.E. 164 at 116. The report states, "It is the opinion of the officer that [Stiltner] is in need of psychological evaluation." *Id*. Mr. Burke testified that this is a "red flag" that indicates trial counsel should have investigated Stiltner's mental health before the guilty plea, even though there was little that defense counsel could do at the point the report was released. *Id*. at 116-17.

The seventh witness was Brandy Harm, a former deputy warden who is now "procedures officer" at the Bell County Forestry Camp. D.E. 164 at 152-53. She testified that she was familiar with DOC policies concerning the intake of inmates with mental health problems. *Id*. at 153. She stated that, currently, all state inmates receive a mental health appraisal, after which a determination is made as to appropriate housing. *Id*. at 153-54. Ms. Harm was not aware of what procedures may have existed in 1986. *Id*. at 154. She testified that most low IQ inmates are housed at Kentucky State Reformatory. *Id*. at 158.

The eighth witness was Stiltner.  D.E. 164 at 160.  He testified that nobody had read the plea agreement to him; he signed it because his lawyer asked him to.  *Id.* at 161-62.  Stiltner said he only saw his trial attorney in court, and that the attorney had never asked him about his time in Eastern State or discussed lesser-included offenses or defenses such as diminished capacity and self-defense.  *Id.* at 162-63.  Stiltner was asked several general questions about trial-related concepts, and often disclaimed knowing what they meant.  *Id.* at 162-63, 169-70.  He testified that he did not remember Dr. Williams's evaluation in September.  *Id.* at 165.  He testified that he did not understand the things his attorney told him in 1986, but he does understand what his current attorney says.  *Id.*

The first witness for the Warden was Tina Scott Bowling, who worked as a paralegal in the DPA's post-conviction unit from 1995 to 1999.  D.E. 164 at 174-75.  Her job included going to prisons to talk to inmates about post-conviction issues.  *Id.*  She had no recollection of Stiltner.  *Id.* at 180.  She signed a letter in 1996 requesting a copy of Stiltner's judgment and plea agreement to review for possible post-conviction relief (D.E. 10-3 at 23).  *Id.* at 176-77.  But she had no memory of creating this document; she testified that she had signed hundreds of such letters.  *Id.* at 177.  She also agreed that she had notarized some forms requesting records from Eastern State.  *Id.* at 178.

The Warden's second witness, the final witness, was Dr. Williams, who conducted the recent psychological evaluation of Stiltner.  His report and testimony have already been described in Section IV.E.

## G.  Additional Claims

Mention needs to be made of some new claims raised by Stiltner.  In recent filings, Stiltner has alleged that his trial attorney was ineffective for other reasons besides failing to

pursue a competency defense. Stiltner faults trial counsel for failing to pursue additional defenses, such as self-defense or the existence of lesser-included offenses. D.E. 170 at 39, 41-42, 45-47, 55. He has further added a claim that his procedural default was due to "abandonment" by his counsel or the Commonwealth's failure to subject Stiltner to a psychological evaluation. *Id*. at 25-31.

Stiltner cannot raise new claims this late in the game. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008).

Concerning his core IAC claim, his petition makes clear that the IAC claim concerns counsel's failure to raise Stiltner's intellectual disability as a defense. D.E. 17 at 5; D.E. 1-1. And concerning default, prior to the hearing, Stiltner asserted that his "significant mental incompetency satisfies the show cause portion of Stiltner's failure to present this claim in state court." D.E. 112 at 16; *see also id*. at 19. Stiltner alleged in this same filing that counsel from the DPA, in the 1990s and 2000s, had failed "to place all relevant documents in the record" and dragged their feet in making filings on his behalf. *Id*. at 5, 20. That argument was aimed at attacking the merits of the state courts' rulings; it was not part of Stiltner's discussion of procedural default. *Compare id*. at 17. Stiltner did not allege in his pre-hearing briefing that DPA counsel's actions constituted cause to excuse his procedural default. *See* D.E. 112 at 5, 20; *see also* D.E. 17 at 13 (listing Dennis Burke as Stiltner's only post-conviction counsel). His position prior to the hearing was that his claim was not defaulted (*id*. at 17-19), but if it was, his psychological problems provide cause, or else there was a miscarriage of justice (*id*. at 19-22). Stiltner argues for the first time in his post-hearing brief that Timothy Riddell represented him in 1996 and 1997 and could have filed a timely post-conviction petition, and that Riddell's

"abandonment" establishes cause for default.[5]  D.E. 170 at 27.  But even after the Warden raised the issue of procedural default (D.E. 110 at 14-20), Stiltner did not offer this abandonment argument in his pre-hearing reply brief (D.E. 112).

Based on Stiltner's pre-hearing filings, the Court confined the scope of the evidentiary hearing to Stiltner's *mental health* as it related to procedural default and the effectiveness of his trial counsel.  D.E. 115, 116.  It would be grossly prejudicial to the Warden to permit Stiltner to expand his claims through post-hearing briefing.

## V.  Analysis

Stiltner's appointed counsel in this matter has thoroughly and vigorously drawn the Court's attention to Stiltner's well-documented history of mental health issues.  Nevertheless, Stiltner has not met his burden concerning the merits of his petition or his procedural default.

Concerning the procedural default issue, the Court can entertain Stiltner's claim only if he can establish cause to excuse his procedural default.  *Williams v. Mitchell*, 792 F.3d 606, 613 (6th Cir. 2015).  "Cause" can be established if some impediment or obstruction prevented the petitioner from complying with the state's legal procedures.  *Martinez v. Ryan*, 566 U.S. 1, 13 (2012).  And cause must be something "objective," "*external* to the petitioner," and "external to the defense."  *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

Stiltner's only argument on procedural default is that his intellectual disability prevented him from filing for state post-conviction relief when he was eligible to do so.[6]  As discussed in

---

[5] Mr. Riddell never participated in any legal proceedings on Stiltner's behalf.  When Mr. Riddell was asked at the 2017 evidentiary hearing, "Did you ever represent Mr. Stiltner," he responded, "I apparently signed one document . . . did not sign, I printed on it, . . . a medical release document for him.  That's all."  D.E. 164 at 79.  Mr. Riddell was not sure he had ever met or talked to Stiltner; he had only seen him milling about in the prison library.  *Id.* at 79, 82.  He was asked, "So other than for a medical release, you didn't represent Mr. Stiltner?"  *Id.* at 82.  He answered, "no."  *Id.*  All Mr. Riddell knew about Stiltner's case was that "that particular initial medical release has my hand printing on it.  And that's all."  *Id.* at 83-84.  Stiltner previously argued to the Court that he was not appointed counsel until 2005.  D.E. 94 at 2-5, 8.  Accordingly, it is not clear that Stiltner and Riddell had an attorney-client relationship wherein abandonment or ineffective assistance would be meaningful concepts.

Section II.C, this Court finds that intellectual disability cannot be an external cause to excuse the procedural default. If the presiding District Judge agrees, then Stiltner's petition must be denied.

However, in the alternative, if the Eighth Circuit's *Holt* standard for determining whether a mental health issue can qualify as cause applies, Stiltner fares no better. In that case, Stiltner would need to make "a conclusive showing" that mental illness interfered with his ability to appreciate his position and make rational decisions regarding his case at the time during which he could have pursued post-conviction relief. *Holt v. Bowersox*, 191 F.3d 970, 974 (8th Cir. 1999). Stiltner has not made such a conclusive showing.

As previously explained in Section II.C, the period relevant for this inquiry is May 8, 1986, to October 1, 1997. Neither party expressed disagreement with the application of this date range. The primary evidence before the Court that pertains to this period consists of the testimony of Stiltner's friends on one hand and the testimony and report of Dr. Williams on the other. Stiltner's fellow-inmates testified rather consistently that Stiltner has a diminished and child-like intellect and that he often relies on their help. This was evidence that Stiltner may have been unable to appreciate his legal position and make rational decisions regarding his case. Obviously, none of these witnesses has any psychological expertise.

On the other hand, Dr. Williams is a very highly qualified psychological expert. Dr. Williams stated in his report that he was "divided" concerning the application of the *Holt* standard in this case. D.E. 182 at 14. Regarding the first prong of this standard, Dr. Williams found it "obvious" from Stiltner's records that he suffers "Mild Mental Retardation." *Id*. at 15. This condition would, according to Dr. Williams, interfere with his ability to appreciate his position. *Id*. Stiltner is not "reflective and planning" and his "forethought is poorly established."

---

[6] Again, the Court will not address claims made for the first time following the evidentiary hearing. *See supra* Section IV.G.

41

*Id.* Yet, as to the second component of the *Holt* test, Dr. Williams found "no evidence" that Stiltner's intellectual deficit interferes with his ability to make rational decisions. *Id.* Specifically, Stiltner's rational capabilities are evidenced by how he

> (1) consistently held employment with the DOC during the time period outlined, (2) received a pay raise based on the merit of his demonstrated work conviction, (3) participated in the DOC self-medication program, (4) received a total of two disciplinary write ups during the said time period (even while serving time in one of the DOC most difficult institutions), (5) met with the Parole Board in 1994, and stated he expected a "deferment, not a serve out", (6) successfully filed for a Parole Board reconsideration hearing, (7) consulted with Tina Scott, paralegal post-conviction, and sign releases in order to begin the process for his appeal prior to October 1997 deadline, (8) because of his "clear conduct" was granted a reclassification, and (9) was granted Honor Dorm status based on his clear conduct status.

*Id.* Accordingly, Dr. Williams opined that the *Holt* standard "cannot be supported in its entirety, and thus is unfounded." *Id.*

All this leaves the Court with less than a "conclusive showing" that Stiltner's mental illness interfered with his ability to appreciate his position and make rational decisions regarding his case at the time during which he could have pursued post-conviction relief. *Holt*, 191 F.3d at 974. On the contrary, the evidence is inconclusive. The "conclusive showing" standard is certainly greater than a preponderance of the evidence. This Court previously found that Stiltner, by a preponderance of the evidence, was incapable of filing a timely habeas petition on his own during the federal filing period. The more stringent standard applicable here garners a different result. The Court also has before it significant new evidence—Dr. Williams's report—that is weightier than evidence to the contrary. Dr. Williams's finding that Stiltner's intellectual disability does not undermine his capability for rational thought precludes a finding of cause to excuse procedural default.

Even if Stiltner established cause to excuse procedural default, his *Strickland* claim fails on the merits.  As explained in Section III, Stiltner's IAC claim stands or falls on whether his trial counsel would have had a "reasonable probability" of success in asserting that Stiltner was incompetent to stand trial on the date of his 1986 guilty plea.  *Strickland v. Washington*, 466 U.S. 668, 694 (1984).    Because the record indicates Stiltner was competent, the evidence preponderates in the opposite direction.

As previously explained, "Criminal law presumes that individuals are competent," and "a finding of competence, once made, continues to be presumptively correct until some good reason to doubt it is presented."   *Garrett v. Groose*, 99 F.3d 283, 286 (8th Cir. 1996).  "[T]here is a general presumption—in the absence of evidence to the contrary—that every defendant is competent to stand trial."  *Short v. Com.*, No. 2013-SC-755-MR, 2015 WL 3631671, at *2 (Ky. June 11, 2015).  The available evidence does not overcome this presumption of competence.

First, the evidence closest to the critical period in 1986 suggests Stiltner was competent under the *Dusky* standard.  As discussed in Section IV.A, Stiltner was twice found competent prior to his 1986 arrest.  The first finding is contained in Dr. Ligon's April 1964 letter.  D.E. 179.  The second is contained in Dr. Ruiz's brief 1976 report.  D.E. 181.  Second and more importantly, his competency was addressed in conjunction with his 1986 guilty plea.  *See supra* Section IV.B.  His attorney signed a "Certificate of Counsel," certifying that Stiltner's guilty plea was "voluntarily and understandingly made."  D.E. 1-3 at 3.    Then, in its Judgment order, the Court found

> that the defendant understands the nature of the charges against him, that the defendant understands the elements of the charge(s) against him and elements of any lesser included offenses and any defenses available to him at trial, that the defendant's plea is voluntary, that the defendant knowingly and voluntarily waives his right to trial by jury[,] privilege against self-incrimination[,] and right of confrontation, and that there is a factual basis for the defendant's plea.

43

*Id.* at 4-5.

As discussed in Section III, another court's finding of competency is question of fact that is presumed correct unless shown to be clearly erroneous.  *See Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005); *Finley v. Rogers*, 116 F. App'x 630, 635 (6th Cir. 2004); *Mackey v. Dutton*, 217 F.3d 399, 412 (6th Cir. 2000).

Clearly, the weightiest evidence outside the court records concerning Stiltner's competency in 1986 is Dr. Williams's evaluation, which took into account Stiltner's entire history with mental health treatment and the criminal justice system.  Dr. Williams (as discussed in Section IV.E) found that, while Stiltner suffers from a lifelong intellectual deficit, "nothing in the record" suggested he was incompetent at the time of his 1986 guilty plea.  D.E. 182 at 14. Dr. Williams concluded "that Mr. Stiltner met the competency standards of [*Dusky*] in 1986, as well as he would today."  *Id*.  Dr. Williams's conclusion harmonizes with that of the Fayette Circuit Court, which in 2014 found "nothing in the record to indicate that at the time of his guilty plea that Stiltner was suffering from any kind of mental illness, disease or defect."  *See Stiltner v. Comm.*, No. 2013-CA-731-MR, 2014 WL 811836, at *3 (Ky. Ct. App. Feb. 28, 2014).

Stiltner stresses that his guilty plea was entered far too quickly—just three and a half weeks after being indicted.  D.E. 170 at 40, 46.  He further argues that he was sentenced on the same day to the maximum penalty available.  *Id*. at 39-40.  He argues those that the plea was made too hastily, with severe consequences, and that his counsel could not possibly have reasonably investigated Stiltner's mental fitness in such a short period of time.  *Id*. at 39-47.  But there is no actual evidence of deficiency on defense counsel's part during this period.  Stiltner relies on the opinion testimony of Mr. Burke.  *Id*.  Yet, on the evidence before the Court, it is just as likely that Stiltner's counsel independently assessed Stiltner's competency and, based upon

44

experience, determined there was no competency issue to raise as it is that his counsel ignored any competency concern that he reasonably should have had.  For example, counsel could have looked into Stiltner's records and seen that he had received previous psychological evaluations and been found competent.  Whatever happened then is now clouded by the dust of decades. More importantly, Stiltner cannot show prejudice because the bulk of the evidence indicates he was competent.

Retroactive determinations of competency are difficult to prove.  *Eley v. Bagley*, 604 F.3d 958, 967 (6th Cir. 2010).  Here, Stiltner was deemed competent after psychological evaluations in 1964 and 1976 and by the court in 1986.  The only expert psychiatric diagnosis before the Court is one that finds Stiltner was competent when he pleaded guilty.  Although the documentary record, testimony, and skillful arguments brought by the defense keep this issue from being cut-and-dried, they do not indicate Stiltner had a reasonable probability of being found incompetent in 1986, had his counsel raised the issue.  He therefore cannot prove the prejudice necessary to support an IAC claim.  His petition fails on the merits.

### VI.  Conclusion and Recommendation

Based on the foregoing analysis, the undersigned **RECOMMENDS** that Stiltner's 28 U.S.C. § 2254 petition be **DENIED.**  It is both procedurally defaulted and fails on the merits.

Although the undersigned believes the recommendation herein is correct, the Court **RECOMMENDS** that a certificate of appealability ("COA") be issued.  Reasonable jurists could find it debatable whether the petition states a valid claim of the denial of a constitutional right and could find it debatable whether this Court was correct in its procedural ruling.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights and mechanics concerning this Recommended Disposition, issued under subsection (B) of the statute. *See also* Rules Governing Section 2254 Proceedings, Rule 8(b). Within fourteen days after being served with a copy of this decision, any party may serve and file specific written objections to any or all findings or recommendations for determination, *de novo*, by the District Court. Failure to make a timely objection consistent with the statute and rule may, and normally will, result in waiver of further appeal to or review by the District Court and Court of Appeals. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981).

This the 18th day of October, 2018.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge